The next case this afternoon is, it was Muller versus New Jersey, but he's now out of a case, so I'm going to do my best.Piszczatoski?Piszczatoski,I think.Piszczatoski.Piszczatoski.Okay.May it please the Court, Your Honor, Alan Gura for the appellants, and if I may reserve seven minutes of rebuttal time.Granted.Thank you, Your Honors. And just to confirm, we've allocated 30 minutes aside, correct?That's correct, Your Honor.Thank you.Under our Constitution, individuals cannot be forced to prove to the police or to a judge that they have a justifiable need to exercise their rights.One cannot be forced to prove justifiable need to have an abortion, to speak, to access counsel, or to refuse an unwarranted search. And likewise, however else the state might regulate the carrying of guns, and we do not dispute that the state does have room to regulate in this area, it cannot condition the exercise of the right to bear arms on proof of one's justifiable need to do so. We recognize that not everyone thinks the right to bear arms is a good idea.However, this case begins and ends with the Supreme Court's admonition that, and I'm quoting Heller here, at the time of the founding, as now, to bear meant to carry. The Supreme Court further instructed, quote, to bear arms, as used in the Second Amendment, is to wear, bear, or carry upon the person, or in the clothing, or in a pocket, for the purpose of being armed and ready for offensive or defensive action in a case of conflict with another person. Close quote.The court went on to tell us that the term bear arms in no way connotes participation in a structured military organization, and that it is clear that bear arms did not refer only to carrying a weapon in an organized militia. As we noted in our briefing, the Supreme Court's definition of bear arms was not dicta.It was necessary to the outcome, given the fact that the term was disputed by the District of Columbia in that case, and that dispute went to the core of the argument that the unsuccessful petitioner in that case went. However, even if it were dicta, this court in Marzarella stressed that, and I'm quoting here again, there is dicta, and then there is Supreme Court dicta. And again, of course, in Barton later on, this court rejected the idea that Heller's provision about specifically enumerated, presumptively lawful exemptions to the Second Amendment were dicta. So this circuit does have some precedent standing for the fact that it is going to take Heller's language seriously. And in the absence of any argument that the term bear arms might mean something other than what the Supreme Court has said it means, I believe that that definition is binding upon the court, and that sets forth the basis for the action here and for the following argument. It's important to recall, then, that as in Heller and McDonald, interest balancing here simply does not enter the equation. The content of our rights is determined by an examination of text, history, and tradition, and not by means and scrutiny. And here the Supreme Court has done the heavy lifting and defined bear arms. Accordingly, this case presents the narrowest possible type of constitutional challenge. And I must stress to the court just how incredibly narrow our claims are. Counsel, this court has already decided in two cases, Marzarella and Barton, that there is a Second Amendment, shall we say, exception to action other than within a home respecting carrying of possession of firearms. Do you concede that? No, Your Honor. I'm not sure that I would concede that. In Marzarella, this court stated that, and this is to quote Marzarella, Heller delineates some of the boundaries of the Second Amendment right to bear arms. The court said, at its core, the Second Amendment protects the right of law-abiding citizens to possess non-dangerous weapons for self-defense. Wait a minute. Marzarella, let me stop you. Marzarella established for this court a two-part inquiry. Is that right? A two-part inquiry, yes, Your Honor. Okay. Now, on the basis of the two-part inquiry, how can you say that we have already gone beyond Heller? I'm not sure that I said that this court has gone beyond Heller. The two-part inquiry, the first step in the two-part inquiry, which is the inquiry used not just in this court but in other courts as well, is to first determine whether the conduct at issue falls within the protection of the Second Amendment. If the conduct is not within the Second Amendment, that's the end of the case. If, however, the conduct is within the Second Amendment, then the second step is to apply some sort of test to see whether or not the challenged law that's implicating that conduct is constitutional. So we begin with step one of Marzarella and try to identify whether bearing arms is conduct protected within the Second Amendment. This court has never said that it's not, and this court is in any event bound by the Supreme Court's definition of bear arms, that in fact it is. In fact, in Marzarella, the court said that certainly, this is to finish my thought earlier, to some degree it means the Second Amendment. Counsel, you're running through open doors here. I'm saying that we have discussed this, okay? Your Honor, I'm not sure that the court has discussed this authoritatively. I don't want to pile on, but I will. I think these issues are closed for purposes of this court, but we apply intermediate scrutiny to the case. We're not going to revisit the text, history, tradition argument that was, I think, most prominently made by Judge Kavanaugh in his dissenting opinion in Heller 2. So I think we can move to, you know, applying intermediate scrutiny to the law at issue in this case. Okay. Your Honor, if I understand the inquiry correctly, then, Judge Hardiman, if we are applying intermediate scrutiny, that means that I would hope there's some recognition that we are talking about conduct that falls within the Second Amendment, at least to some degree, because if it did not... If it didn't, well, no, I mean, I'm speaking only for myself. You don't have a Barton problem or a Marzarella problem. Those were carve-outs. Those obliterated serial number and felon in possession were clearly, I think, stated by the Supreme Court, not covered by the Second Amendment. That's right. And we know from Heller and McDonald that certain types of people have no Second Amendment rights, and we know that certain weapons do not fall within the cognizance of the Second Amendment, e.g., machine guns. But, obviously, you've got a handgun at issue here, so... That's correct, Your Honor. Go ahead. Well, if the court would apply intermediate scrutiny, if that's the approach that the court would take, then we're still entitled to prevail because under intermediate scrutiny, the test is that the government bears the burden of proving that there is a reasonable fit between an important governmental interest at stake and the law that is at issue. Then you're not going to fight against the government interest. That's an easy one. I think you conceded that in your brief. The state's interest in public safety is significant. Your argument, as I understand it, is there's not a fit here. There's no dispute that the government has a significant interest. I would even go beyond what we would need to do and say there's obviously a compelling interest in public safety that allows the government to regulate firearms in some manner. However, there is no interest in abolishing or restricting a right for its own sake. That is, whatever else the government might decide, it cannot be that the exercise of a right is itself contrary to the public interest because the Constitution defines ultimately what's in the public interest. And so if there is a right to carry arms for self-defense, it cannot be whatever. Of course, there's an interest in making sure that violent people don't have access to arms or that people don't carry in sensitive places. No dispute there. But there is no interest at large to prevent law-abiding, responsible adults from exercising a right because the government has determined, never mind the Constitution, that the right itself is harmful. And I think that's the justification that we are seeing from the other side. And what we saw in the district court is this idea that carrying guns is inherently dangerous and inherently contrary to the public interest such that it can be restricted. And that we would very much dispute. It would satisfy intermediate scrutiny if the government were to delineate certain sensitive places into which people could not carry arms. Time, place, and manner restrictions. Counsel, on that, let me say that I would like you to address the Second Circuit case in Kachalski because I'm speaking only for myself. I felt that that was a very impressive opinion. Well, Your Honor, by the way, I appreciate the court asking the parties to submit supplemental briefs tonight. Thank you for allowing us the opportunity on Kachalski and also on Moore. Unfortunately, Your Honor, I don't share Your Honor's admiration for the Kachalski opinion, as you might expect me to say that. And we did file a cert petition on that and we're waiting, of course, to see what happens there. Kachalski erred in many, many ways. You were counsel there, right? That's right. Let's go through some of the error. The first error in Kachalski, it's hard to know where to start, but I think one of the errors that jumps out is the court's rejection of the Supreme Court's definition of the term bare arms. Kachalski stated that, yes, we acknowledge the fact that crime is unpredictable and that we never know when someone might have the need to use a firearm in self-defense. However, because the right of self-defense does not itself come into play until a person is suffering a criminal attack and has reason to use a deadly force, then there's no right to be armed and ready for that contingency. But the definition of bare arms that we started out with states that people have a right to be armed and ready in case of a conflict. So, of course, Dick Heller or Otis McDonald had no right to shoot people from their homes until somebody actually came through the window or through the front door. But if we use Kachalski's logic, then they would not have had a right to even acquire the handgun in the first place to defend their home because the self-defense need not immediately manifest itself. The other problem that Kachalski had was that it seemed to apply rational basis review, and I know that they used intermediate scrutiny in that. They invoked intermediate scrutiny. But it was a case of rational basis review to uphold that provision. The court started with a presumption of constitutionality and deferred completely to the legislature. You relied on all the precedents that Justice Breyer relied on in his dissent. Did the court allocate a burden in that case? The court cited the NFIB v. Sebelius case and stated that there was going to be a presumption that we had to overcome to show that the statute was unconstitutional. So the burden was on you, not the government? It was. And that's something that we took up specifically. And I can tell you, Your Honor, yesterday we had seven briefs filed in support of our petition, and many of our amici pointed that same flaw out, that there was, in fact, a burden imposed on the plaintiffs in that case to defeat what was considered to be the predictive judgment of the legislature. But, again, that's not true either because what the court deferred to was not so much the predictive judgment of the legislature in crafting the law, but the predictive judgment of the licensing official to predict whether or not somebody has proper cause to carry a firearm in the event that they might perhaps suffer a criminal attack. That level of prediction, that level of clairvoyance, is not something that any licensing official has in America. We wish that they did. Crime would not exist if we could predict it to that degree. I didn't read anything in Kuchelski that talked about differential treatment within the state of New York, but I've read secondary sources that have indicated that the law is enforced in widely disparate ways. In other words, the cities are very restrictive, and the rural areas in New York are extremely liberal with handing out the permits. Was that at all an issue in Kuchelski or not? That was not something that we raised specifically, although we did argue that it was inherently arbitrary. And what we do know about these laws is that whenever you have a discretionary permitting system that really does leave such a level of unbridled discretion in the licensing officials, you do see a lot of not just arbitrary conduct, but conduct that raises a lot of eyebrows. We know that historically these May issue type laws were basically Jim Crow. We have – right, but forget the history for a minute. What about New Jersey? Is it just suppositional or – I didn't see anything in this record to indicate that, you know, if I live in County X, I'm going to get my permit because I can easily satisfy the justifiable needs standard, and if I live in County Y, I'm almost impossible to get a permit. But that really wasn't a part of the case, although we did argue and we do submit that it is arbitrary for everybody, and we don't begrudge anyone their permit. If somebody obtains the ability to exercise their Second Amendment rights out of favoritism or something else, that's nonetheless a constitutional right to have a weapon so long as they're law-abiding, responsible people and they otherwise obey the law and meet objective standards. So we're not begrudging other people their permits, but the fact is that if you look at the New Jersey standard, it's quite a standard. It requires to show the urgent necessity for self-protection as evidenced by specific threats or previous attacks which demonstrate a special danger to the applicant's life that cannot be avoided by means other than by issuance of a permit-to-carry handgun. I would submit anybody who truly, in my reading of this language, satisfies that should probably just leave the state. I mean, to say that you cannot avoid the harm that's about to befall you is quite a standard. Do you see any meaningful difference between that definition and the definition of proper cause in the New York statute that is shown in Petrovsky? Not really, Your Honor. Both of them, and we see different language. The statute that was struck down in the Maryland case talked about a good and substantial reason. In all of these states, the very few states that have these, it basically boils down to the idea that whatever you need in order to obtain a permit is by definition not going to be commonly possessed by other people in the community or other members of your profession. And so, by definition, it's going to be rare, and there will be complete discretion in the licensing authority subject only to an abusive discretion standard, but since there's really no standards for the issuance of the permit in the first place, as a practical matter, we see that it basically means that people do not get permits unless there's some almost a random chance or perhaps a relationship that isn't officially known, and we do see that. You may have just alluded to it, but I was trying to understand. You argue that the effect of the requirement, the justifiable need requirement, is to limit most people from bearing arms in New Jersey. I wasn't sure what the basis of that conclusion was. Is there something in our record that gives us any indication how many people have these permits, how many tried to get them? I don't have that in front of me. There might be something in the record. We know that it's extremely rare. There has been studies. Well, I guess I want to know how we know that as a court sitting here, because as Judge Hardiman alluded to introducing the case, one of five or however many plaintiffs it is ended up dropping out because he got a permit over the course of this litigation. How do I know it's extremely rare? Well, what's important to note, first of all, Your Honor, I'd be happy to submit supplemental information to the court if the court wants under Rule 28. But what I can tell you is we are presenting specific individuals here and organizations whose memberships generally are precluded from having these permits. All these individuals have been denied, and it's their individual specific rights here that are at issue. And we submit that they have the right to come before a federal court and say that they've been deprived of the ability to exercise a fundamental right. Well, certainly, I understand that. But if we do apply intermediate scrutiny, don't we have to assess how good a fit there is in serving the governmental interest? And at that point, doesn't it become relevant whether you're right that the effect is very few people get it or whether you're not right about that? Well, I think under intermediate scrutiny, the government would have to show evidence, and I don't believe there's any evidence of this, that the standard largely operates against people who should not have firearms. There's nothing to show that virtually everybody who's denied by the standard is a felon or is mentally irresponsible. We know that the issuance rates in these more what we call shall-issue jurisdictions don't wind up licensing dangerous criminal individuals. And it's the government's burden to show that there's a reasonable fit here. I don't believe that there's been any evidence on that at all. If they were to show that we've had X number of applications and it turns out that 99 percent of them have been by people who are felons, but then again, all those can be addressed by objective standards. There's nothing wrong with a rule that says, you know, we're going to have a background check, and if it turns out that you have a serious problem, then you're going to be denied a permit. In fact, even under the so-called shall-issue systems that prevail in most of the United States, there's still room for discretion. It's just that the burden is on the government to show, by reference to specific evidence that came out in an investigation, that there was some reason to deny the person, and then so long as that person has been processed, then the system is okay. So we're not against the idea that there can be no discretion whatsoever. All we're saying is, and this is an extremely narrow case, is that if there is a right here, and there is indeed a right, to exercise access to firearms in public for self-defense, then however else the state can regulate it, it can't force people to prove that they have a need to exercise what is essentially their right. At that point, the right disappears. And there's no way that, starting from the presumption that nobody is entitled to exercise this right and burdening the applicant under this very tough standard to access a right, that that has a reasonable fit to any sort of governmental purpose. The court in Maryland counseled that. I regret interrupting you again, because from your brief, I felt that the gut issue that you were challenging was the expression justifiable need. You felt that there was no bounds on the part of the chief of police or the superior court judge to have a standard of what justifiable need. And I'd like you to address that, and addressing it because you are familiar. In the Second Circuit case, what was it, just plain need? Was the magic word there rather than justifiable need? The Second Circuit case, the standard was proper cause. Proper cause. And what we've seen throughout the cases that have examined what is essentially prior restraints is that whether to help proper cause or good cause or good moral character, sometimes they try to phrase it in a sort of character. The issue is, are there any standards, objective standards, that limit the discretion of the licensing authority? And if there are not, then at that point, then the authority loses, because you're talking about a fundamental right. In New Jersey's case, under the administrative law, there was a definition, the administrative code rather, there was a definition of justifiable need. Was there not? Yes, and the definition is equally vague, as we've said. Urgent necessity. Who can tell why somebody has an urgent necessity to access a fundamental right? We've seen Supreme Court cases deal with language like this. Whenever it's for the good of the community or such a vague language. This is not an objective standard. This is a euphemistic, idealistic language that really vests total discretion in the licensing authority. And it doesn't matter how many additional euphemisms can be piled on top of the standard. It's still not anything that says, you know, if your conduct fits into this category, you're prohibited. If your conduct fits into another category, you're okay. And there's nothing here that relates to putting a burden on the government. You can't be serious that justifiable need has no boundaries whatsoever. I'm very serious about that. As you have just described, I'm simply saying that I think you are arguing too much on that point. Well, with 15 seconds left, perhaps I should... The superior court judge has no bounds under justifiable need. But you will concede that you are asking a court to define justifiable need in your favor, saying that it is too vague. Isn't that what you're asking us to do? No, we are not asking for the courts to define justifiable need. And to be very clear, nothing in our brief takes issue with the fact that our clients, that my clients actually met the standard and should have qualified. The objection here is to the standard itself. We claim we have a right to do something. The government says, no, you don't. You can't do it until you show us that you have a justifiable need to exercise something that is your right. And we're saying that that is a boundless grant of discretion. And it's not consistent with a fundamental understanding of what a right is. We would never apply an urgent necessity or justified need standard to any other constitutional right. And we wouldn't... How does the administrative code of the state of New Jersey define justifiable need? Well, as I quoted earlier, it defines it as follows. This is under Section 1354-2.4D1. It talks about the urgent necessity for self-protection, whatever that means. It's evidenced by specific threats or previous attacks which demonstrate a special danger, okay, to the applicant's life that cannot be avoided by means other than by issuance of a permit to carry a handgun. I submit that that is totally boundless. There's no way that we can look up and say yes. Well, it's not boundless. I mean, read the words. I mean, as I read the words, if somebody has beaten the stuffing out of me five times, but they haven't, you know, they may have put me in the hospital, but they haven't put me in danger of losing my life, then under that definition I'm not entitled to a permit. Wouldn't you agree? I'm not sure, Your Honor. We had Mr. Mueller's example actually is a fairly interesting way to look at it. Here's a gentleman who was kidnapped by a gang, taken across state lines. He managed to escape. The police thought he had justifiable need, but the first judge thought he didn't. Then he went to the second judge, and that second judge changed his mind. I mean, who's to say that this kidnapper... But there are good reasons why the judge said no, right? I mean, the perpetrators were captured. It was a case of mistaken identity. There was no indication that this gentleman was targeted. It was a case of mistaken identity. So I'm, like Judge Aldister, I'm a little perplexed as to why you're arguing the case on this ground rather than just saying that it's far too narrow. Instead of arguing that you have to go through too narrow a door to exercise your right, what you're apparently arguing is it's standardless, boundless, and who in the world knows what it means. I'm reading the words, and I think I know what it means, but it's... Well, we're saying several things. The first thing we're saying is that this standard is, in fact, up for, you know, perhaps reasonably people can disagree about what urgent necessity means. This is not a hard standard. This is not the type of objective standard that we would like to see when we're talking about fundamental rights. But beyond that, what we are saying is this is simply not appropriate to burden a fundamental individual right that's enumerated by telling the applicant that they have the burden of proving that they should be able to access that right. The presumption has to be that people are law-abiding and responsible and they are entitled to their constitutional rights in this country. We don't have to prove each time, every time we want to exercise a right, that we have a really good reason to do so. There's nothing wrong with licensing as an abstract matter. We do not challenge the concept of licensing. We do not challenge objective licensing qualifications. And we don't challenge other restrictions placed upon the behavior after licensing, like time, place, and manner. But when someone says, as an initial matter, I would like to exercise my fundamental right today, the court simply can't say prove it, that you're entitled to it under some standard that Your Honor may see very reasonably, very differently than another very reasonable judge. All right. Your reserve rebuttal. We'll hear you again. Thank you. Thank you, Your Honor. Mr. Guerra. Thank you. Ms. Wood. Good afternoon, Your Honors. Mary Beth Wood, Senior Deputy Attorney General for the State and the Descendants Appellate. Your Honors, The New Jersey Carry Permit Law does not impermissibly burden conduct protected by the Second Amendment. It is, as this Court has discussed in the Marzarella case, it is outside that core right protected, the core that the Supreme Court discussed in Heller, that is the right to self-protection in the home. All right. I just gave Mr. Guerra grief for fighting on a ground that I thought was built on quicksand, and so let me give you equal time. Okay. The opening line of Justice Alito's opinion for the Court in McDonald's says, two years ago in District of Columbia versus Heller, we held that the Second Amendment protects the right to keep and bear arms for the purpose of self-defense. I don't see anything therein that limits the right to the home. Now, granted, we don't know, to repeat the phrase that others have used, we don't know exactly what the contours are in this terra incognita that we've been placed into following Heller and McDonald, but it seems to me a matter of elemental logic that the individual right to keep and bear arms applies to some extent outside the home. Is that not right? I think that we have argued that that is correct, but it is subject to regulation. All right. So then maybe we could move quicker to the intermediate scrutiny, and I think I misspoke before. In Marzipan, I don't think we said explicitly intermediate scrutiny applies. We said it's either strict or intermediate, but let's assume for a minute intermediate applies. I think, Judge, that the majority of courts have agreed with that. And even Kuchelski, which came out your way, said it was applying intermediate scrutiny. And your friend on the other side has conceded you have a compelling interest in public safety. So would you focus for the court then on the fifth question and explain to us why or how the government has satisfied its burden to establish that this law is substantially related to the achievement of the government's important interest in public safety? I think, Your Honor, as we've discussed in our brief, that the idea of the public safety and the weighing of the risk in exercising that right to all of the other people in the state of New Jersey is an important fact that weighs in favor of the state in this instance. The state has, and I think the majority of courts to consider the question, have said that the lawmaker's hand can't be tied, and I think that was actually from Kuchelski, to ward against armed mayhem in the streets. Long ago, the New Jersey Supreme Court said that reasonable gun regulation, which is what New Jersey has, should not be thwarted so that we're back to the frontier days in the state of New Jersey where people are in the Wegmans and the Wah-Wah with a gun strapped to their thigh. Are you suggesting there's armed mayhem in the state of Vermont today? I am not. What's the murder rate in Vermont as compared to the other 50 states? I don't know what the murder rate in Vermont is, Your Honor. What if I told you it's one of the lowest and they have the most liberal gun control laws? I would ask what the population is in Vermont then, Your Honor, as compared to New Jersey where there's a dense population of individuals. It seems to me Vermont has been there. So the Second Amendment right, which the Supreme Court incorporated against the states in McDonald, applies disparately depending upon whether a state is a rural state or a densely populated state? No, Your Honor. I think what we're saying here is that the Second Amendment and the right to carry a weapon in public has always, through history, been subject to regulation. New Jersey's regulation is no different than the regulations or is of similar type to the regulations that are in effect in the majority of states and throughout history. There have been bans on carrying a weapon. Concealed carry has a storied history of being heavily regulated, if not banned, correct? Yes. All right. But is it not true that the states that banned concealed carry did allow for alternative channels, i.e. open carry? I think that some of them did, yes. Then what argument do you have from history of states that have – well, let's focus on New Jersey for a minute. Am I correct in understanding that New Jersey prohibited open carry for the first time in 1966? I don't – I saw that in the briefs that were filed by the appellant. I don't agree with that. I think that the law – some of the laws did specifically discuss concealed carry. I think the law now doesn't use the word concealed in the law, but I think it's a case-by-case basis, which is what our courts have said when you're applying for a permit to carry. It just depends on what your need is and what – Well, what statute – my research, with the help, of course, of my trustee law clerk, is that the 1966 statute, for the first time, New Jersey required permits for open carry. If that's incorrect, can you point me to what law in New Jersey required a permit for open carry prior to that time? I don't think it was stated before that time. I'm not aware. A statute in New Jersey – the first statute in New Jersey about carrying was in 1924, and I'm sure you're familiar with that because in the legislative history, that's a beginning point, is 1924. Now, tell us what that statute said. Your Honor, I don't have the specific words, the language of that statute in front of me. I apologize. What do you have on that at all? On the earlier law? On the 1924 – I'm trying to – what's the name of the case? Sicardy?  Sicardy. It's Sicardy. I think that what Sicardy said is that – it talked about reasonable regulation, and the need to carry a weapon was needed to be established before the law allowed for somebody to carry in public. Okay. You're not familiar with the 1922 law that Judge Aldister referred to? I don't have it in front of me, Your Honor. What about the 1905 law? I don't have that in front of me either. As far as I can tell, 1905 was the first law where concealed carry was prohibited. You're not familiar with that law? I did not look that up before I came here today, Your Honor. All right. Well, if we accept this true, you've got a long historic argument about concealed carry being prohibited. But I'm trying to get to the bottom of what I think is the tougher question, because I think Mr. Gurra may even concede on rebuttal that you could prohibit concealed carry as long as – it's sort of like the First Amendment analog. Are there alternative channels to exercise the right? So can you tell us anything on the open carry question, or whether there were alternative channels to exercise the right to keep and bear arms even while concealed carry was deemed illegal? I'm not aware of any case law in New Jersey that discussed the availability of an open carry while having a ban on concealed carry. There is nothing in the history of the case law in New Jersey that specifically discusses that. And there's nothing in the history of the case law that points to the fact that open carry was permitted in New Jersey. Well, if it wasn't permitted, it would be easy for you to tell us that it wasn't. You cite a case, you cite a statute. What New Jersey law, regulation, case tells us that open carry was not permitted before 1966? I'm not aware of one that does. There is no case law that discusses it. There's no – but there's no case law that says it was permitted, but there's none that says that it was not permitted either. Let me try to come at it another way. I thought we're arguing for the long-standing policy exception, which would mean the Second Amendment wouldn't even apply. Is that a position you're advocating? That is our first argument that – And in fact, I think the district court agreed with you, right? Absolutely. So, can you tell us on what basis we could agree that the district court was right that the long-standing policy exception applies? Or are you admitting that district court was wrong on that? No, I'm not. I was just answering Judge Hardiman's – All right. Judge Hardiman's request to move to the intermediate scrutiny. Well, then tell me on what basis we could find that the long-standing policy exception makes this constitutional. Well, I think that the Sephardi decision and all the New Jersey decisions demonstrate that the New Jersey law has been – or the ability to carry a weapon outside of your home has been subject to regulation, to a determination of need since at least 1924, and has been part of the history and tradition of restriction on possession in public that has been recognized throughout the nation. And based on that – Does the justifiable need definition that we have in front of us now, does it have that long-standing history going back to 1924? The requirement for need has – to establish need before you're allowed to carry a weapon in public has been in effect since the 1920s. The Sephardi court discussed that. And as have other decisions since then, discussed the fact that a demonstration of need, the definition or the requirement changed as the courts clarified. But the requirement to demonstrate need has always been part of New Jersey's law. But it's gotten much stricter over time, has it not? No, it's not that it's stricter. It's that it's been explained. If it didn't get stricter, why did the Supreme – that, quote, stricter measures concerning the issuance of permits are being applied, and that denials are common where there is no showing that they are, quote, absolutely necessary under the circumstances? That would seem to indicate a tightening of the right following Security. Is that wrong? Well, I think, as I said, the requirement for need was explained further in Security. It was defined more fully in Security. But the requirement for a need before you were granted a permit to carry in the streets of New Jersey has been in effect for almost a century. And based on that, it is a longstanding regulatory measure. It is not a ban. There are people, as Your Honors pointed out, Mr. Mueller received his permit and dropped out of this case. People do get permits to carry in the state of New Jersey when they demonstrate justifiable need. And it's up to the judges to make those decisions? Well, it's an initial decision by either the police, the local police chief or the superintendent of the state police to make a recommendation as to – upon the application. But the buck stops with the superior court judge. Then a superior court judge will make a decision. There is a right to due process. How do you square the superior court judge being the final arbiter with the majority statement at the end of Heller that, quote, a constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all, end quote? Well, I think that the guarantee is not an unrestricted one. When you are talking about outside of the core protection in the core right in your home, when you are dealing then with the public safety interest that the state, everybody here has agreed is compelling, and the recognition in Heller and McDonald's and in almost every court to consider the matter, that reasonable regulations are permissible when you're talking about the right to carry a weapon outside of your home. But what's the fit here? All I see in the record is misuse and accident. Are there other rationales? Were there legislative findings or studies made by the legislature in this regard? I'm not aware of studies by the legislature. How does the government carry its burden if we apply intermediate scrutiny? A big yes. I understand you'd rather just say that there's no protected right, as the trial court did. But if we apply intermediate scrutiny, how does the government, from what body of evidence, how does the government prove that the law, the encumbrance on the right, the burden on the right is substantially related to achievement of the public safety interest? Well, certainly limiting gun ownership or not gun ownership, the right to carry a gun out in the street to people who have a justifiable need, serves the interest in public safety, and that's the biggest interest. I'm not sure, but I find that counterintuitive, quite honestly. Let me give you a hypothetical. Let's say a person lives in a high-crime neighborhood, and he's walking his sixth grader to school. Bullets are whizzing by his ears. There are, unfortunately, neighborhoods in America that are shooting galleries. That gentleman goes to get the permit, and he gets one because he has a justifiable need. Why is he less likely to misuse that gun or have an accident with that gun than some suburban gentleman who doesn't really want a gun, except to lock it in a closet without ammunition? Wouldn't that second gentleman be less likely to misuse or have an accident with the gun than the person who lives in a high-crime neighborhood who has established a justified need? Well, according to your scenario, sure, that person wouldn't be subject to misusing it because they're locking it in a closet unloaded, and it's in their home. Right, so the people who want to tote the guns, the people who are eager to have the guns and tote them on their hip, they would be more likely to have an accident or misuse it than somebody who is averse to guns, who just wants to keep it somewhere tucked away in their home. But the permit-to-carry law wouldn't be implicated in that situation. Well, that person wants a permit-to-carry in case they change their mind and society becomes more dangerous. Both have applied for a carry permit. That's my hypothetical. Why is the guy who lives in a dangerous neighborhood who wants to tote it around every day less likely to misuse it or have an accident than the person who really just wants to get the gun as a fallback or a safeguard? Well, I think all of those determinations, Judge, are based on the case-by-case analysis and the weighing process that the court is going to make in ultimately deciding to grant or deny that type of application. And so you would have to look on those case-by-case determinations and weigh the increased risk to society and to the other people in the state of New Jersey from the person who wants to carry the weapon all the time and make those individualized determinations. And in that way, there is a reasonable fit because we are weighing and balancing the competing interest, the compelling need for public safety that the government has with the need for the person... But your compelling need is to reduce the number of guns in circulation. No, Your Honor. You're saying less guns, safer New Jersey. And you could clearly be right about that. That could very well be true. But isn't that your argument at its essence? No, Your Honor. I think what we're saying is that we must weigh the competing needs of the public safety versus the person's need to carry a gun and interfere and potentially harm somebody in the community by carrying that weapon. Let me get into this right now because I would like to get it before your time is up. The real issue presented by your friend's brief was that the word, the justifiable need, quote, unquote, standard is too vague. Now, that is the critical issue that we have to decide. What is your response to their argument, which is their critical argument? It says, this statute is unconstitutional because the heart of it is justifiable need. And that is too vague an expression. Your Honor, I don't think it's too vague an expression. It's defined by the administrative code. It's defined and explained by the cases in the state court that have considered the issue. The Supreme Court of New Jersey has explained... No, let me stop you right there. Right there. The cases that you're talking about, the history, really it was the word need rather than justifiable need. Does that make any difference? No, I think the Sicardy court and the court in Berinsky, which is in 2003, and I think the court in Prius, they all discussed what justifiable need was. And they all... Okay. And they found that definition, and they gave explanations and examples of what it meant. I don't think that it's so far out there that it's not clearly understood. And because it has been in effect for so long, the people of the state of New Jersey understand what it means. It's been explained through regulation. It's been explained through statute. It's been explained through case law. And so it does have boundaries. It does have... And it is not just meaningless. Does a citizen have to establish a justifiable need to speak in a public park? Generally, no. Then why should the Second Amendment be treated differently than the First Amendment? Because the Second Amendment could result in people being seriously harmed. And the courts have always recognized a limitation on the right in the Second Amendment, and that it has been subject to regulation. Free speech is... Free speech is subject to regulation. But you don't need permission before you exercise the right. Mr. Gura conceded that you can regulate it. You can make people demonstrate safety awareness, the ability to shoot. You can regulate it in a variety of ways. But the question is, do you have to get permission before you exercise the right? The Second Amendment is different. And I think that the majority of courts that have considered the issue have found that because of this very serious potential for harm, because of the history and tradition of regulation, of gun ownership, of gun carrying in public, that there is a valid distinction. That's a distinctly minority view, though, isn't it? I mean, there are over 40 states that are shall-issue states, and only New Jersey, New York, Maryland, California, Illinois, Massachusetts, I think there are six. So why would the constitutional right be circumscribed based upon what a distinct minority of the states view as the cost-benefit analysis of guns? Well, I think, again, Your Honor, I go back to this regulation of gun ownership was prevalent throughout our history before this nation was created. It was prevalent in England. It was prevalent in the frontier days. And this is just a continuation of that and of those restrictions and a reasonable restriction on carrying in public that it does not operate as a total ban, which New Jersey does not have a total ban. It does not implicate the core right in the home. It only operates to allow a weighing and an explanation before one is carrying a gun in public. And it is a public safety measure, and it's a valid public safety measure that's been longstanding. I want to make sure I understand you. I just want to try this one out on you. When we talk about justifiable need, isn't this a standard would be an objective need for self-defense? How would you evaluate something like that? I mean, the definition. Right. Evaluate. We would say in answer to the statement of your friend saying that it's too vague, couldn't the government come back and say what we're talking about is an objective need for self-defense? That would be what justifiable need would be. Or you haven't thought about that? No, I think that that's what the definition does say, that it's evidenced by specific threats or previous attacks. That's an objective test. It's show me. It's not just give me examples of possibilities. It's here. I've been attacked. I walk my child. To use Judge Hardiman's example, I walk my child to school every day, and I'm dodging bullets all of the time and walk through walls of gangs or something. But the definition, the justifiable need definition is objective. It says what's the necessity? What's the urgent necessity? Give me an example of a specific threat or a past history of attack. Those are objective measures, and based on those, the court shall grant if you meet that and won't if you don't. I want to make sure I understand New Jersey's position on a couple points. Half of your briefing at least is devoted to arguing that there is no Second Amendment right at all outside of the home, and I know we've asked you a lot of questions based on assumptions. Is it still New Jersey's position that there is no Second Amendment right outside the home? I think that what we've said is that it falls outside of the court, as did the brief. Point one of your brief is entitled, The New Jersey Carry Permit Law does not impermissibly burden conduct protected by the Second Amendment, and I understood that to mean in part you didn't think the Second Amendment was even implicated. Yes. Is that still your position? Yes. Okay, and then the appellants say in their reply brief that you have conceded that at least a purpose of the justifiable need requirement is to prevent most people in New Jersey from obtaining permits to carry handguns in public. Are they right about that? No. You've not conceded that? No. Is it true? Your Honor, I haven't done any assessment of how many permits are granted versus how many are denied. Is one of the arguments the state is making on behalf of justifiable need a desire to limit the overall number of handguns in public? I don't think that we've ever said that, Your Honor. I think that what we have said is that it is a public safety measure, and our goal is to protect the public safety from the risks that are recognized by the accidental use and the misuse of guns. It is not simply to say, I don't want to have that many guns on the street. We've never said that that's what the reason is. But how do you escape the logic that if your two pillars of rationale are misuse and accident, isn't it inescapable that the more guns there are, the more accidents and the more misuse? But it's more focused than just, well, we don't want that many guns on the street. And so I don't think that that's really a valid way of stating it. And I don't think the state would just acknowledge that that's what the reason is. The reason is a public safety reason. It's not just simply to not have guns on the street. It is to protect the public safety. How do you protect the public safety? By having fewer guns on the street? Fewer people toting guns around? By having people, only people with a justified need, be able to carry a gun on their person in public. We have no legislative findings that people who are the victims of assault or people who have their lives threatened are less likely to misuse or have an accident with a gun than people who have never suffered assaults or who have never been threatened. Governor, we did not cite any in our brief. I can certainly go back and look at the legislative history from the 60s, the 20s, and the teens and look at that for you and provide you with a list. We'll give you 10 days if you care to submit something on that, if you find anything. Okay. We'd be happy to hear about that and opportunities. What I would like to hear, since you're going to help us out there, I want, this is like a broken record, a justifiable need. The main issue in their brief was that the statute violates the Second Amendment because the concept of justifiable need is without standard. Again, I disagree with that assertion by the appellants. I think that the justifiable need standard is a standard. It's a clear standard. It's been explained through case law. I'm suggesting that you discuss that in your supplemental brief. Okay. I'll be happy to do that, Judge. Thank you, Ms. Wood. Thank you. Rebuttal, Mr. Gurr? Thank you, Your Honors. First of all, Your Honors, it is not the sole argument that we made in our opening brief. We've spent about an equal number of pages also discussing the fact that even if we were to apply means and scrutiny, it would fail, not just risk scrutiny but also intermediate scrutiny. That is something we explored at great length in our brief, so it's not just a vagueness challenge or a challenge to the prior strength nature of the justifiable need law. On the intermediate scrutiny question, Your Honors, I think it's important to take a step back and remember what intermediate scrutiny is supposed to do. It is supposed to be a balancing test. You balance the right against the regulatory interest. You do not use intermediate scrutiny or strict scrutiny or rational basis or any of these balancing tests to figure out what the right actually is. So first we have to identify the right as in step one of Marzarella. Then once we've discovered the right and defined it, defined it according to text, history and tradition, then we can go to some sort of balancing test. And in this case, the court is interested primarily, I guess, in intermediate scrutiny. Now, whatever the interest that the government might assert in an intermediate scrutiny test might be, it cannot be that the right itself is inherently a bad idea. That is not allowed. So while we would concede that the government has an interest in regulating firearms generally, we do not concede in this case that the government has any interest at all whatsoever because they're not regulating the manner of carrying guns, the places in which guns are carried, the types of guns that people carry. They're not regulating training standards or anything that relates to public safety. They're basically saying we think this right is a bad idea. If you exercise this right, you will hurt people. Other people have as much right, perhaps more right to be free of your rights, and therefore we're going to start with a presumption that you don't get to enjoy this unless you prove an extra special good reason to do so. And we would submit that the only reason we need to carry a gun for self-defense is stated in the Second Amendment, which the Supreme Court has now told us secures an individual interest in self-defense. But don't you have to concede that you don't have a right to carry a concealed weapon? Step one of Marzarella, if we look to history and tradition, there's a long storied history of legislatures in the states, pre-incorporation and post-incorporation, saying essentially, correct me if I'm wrong, saying essentially bad people hide weapons on their persons, good people wear them in plain view, and we're going to ban concealed carry because we don't want to give a sucker to criminals who want to come around and destroy the place. And we are not asking specifically for a right to carry concealed weapons. That is not the complaint. That's not the request here. The request here is not to carry a weapon in any particular manner. The request is to simply access the Second Amendment right with the understanding, of course, that the state can tell us we're going to ban concealed carry. If you want to carry a gun in New Jersey, you have to carry it openly. That would be an appropriate decision. It would be an unusual decision. I believe the only state left that does that, actually, is Delaware, where there's a discretionary system for the issuance of concealed carry permits, but Delaware does allow the open carrying of handguns in most circumstances. And so that's a choice New Jersey can make. It would be supported by the tradition of our Second Amendment. And if we don't like that, that's too bad. But that's not the issue we have here today, because New Jersey did ban the open carrying of guns. They bar possession without a license, and the only thing the license allows is concealed carry, and it allows it only if you have a justifiable need. When was open carry first banned? I believe that this changed in – I have notes on this, Your Honor. This is something we did look up. I believe that in 1966, the word need – this is from Sicardy. Sicardy went over this ground about the 1924 legislation, and it said that the word need had appeared without alteration since 1924, but they were going to apply a new standard of need. I believe up until that time, you could carry openly in New Jersey from 1905 to 1966. My understanding is that a license was needed for concealed handguns only, not for open carry, and then I think it was changed to possession, if I'm remembering this correctly. Like my colleague, I don't have the text of all these particular statutes in front of me. Is it that history, whatever it is, that is your response to the longstanding policy exception to the Second Amendment? That's right. And there is no history whatsoever, not in New Jersey or anywhere in this country, that could be considered longstanding that states have totally banned the carrying of all guns, open or concealed, or subjected them to this kind of – In terms of length of time for longstandingness, if that's a word, you would concede 100 years would do it, right? No, Your Honor. Longstanding, if you look at this court's decision – What about the felon in possession statute? I thought those date to the 60s. But the court has sustained not just the felon in possession, but much newer restrictions like misdemeanor directed violence prohibitions. Courts have sustained those by analogizing to a framing error practice. And when Heller talked about felons being outside the scope of the Second Amendment as it's traditionally understood, he was talking about framing error understandings and whether we look to 1791 when the Second Amendment was ratified or some people suggested 1868 when the Fourteenth Amendment came into place  The fact is that in neither of those times was the Second Amendment right understood to exclude people carrying handguns for self-defense. Those are quite the contrary. Courts had struck down throughout the 19th century laws that barred too much. They sustained concealed carry prohibitions, and regrettably in the South they also sustained prohibitions on the carrying of particular handguns, the handguns that were accessible to the freedmen primarily. But in none of those cases was there ever sustained a total prohibition on the carrying of handguns openly and concealed. And this type of discretionary licensing system is definitely a 20th century, a late 20th century for the most part, feature in New Jersey. It was Socrates in 1966 that suddenly told us that the word need had acquired a new and different more restrictive meaning. And so there's no long-standing practice here that informs this. We are talking about, if we're going to look at long-standing tradition, text, history and experience, people have a right to carry handguns for self-defense. However the state might regulate it, and we are absolutely not attacking any other regulation here, it cannot be that as a matter of interest balancing, the state has an interest in saying this right is too dangerous to allow. And one last thing, I recognize my time is out, Your Honors. Council did state, I think helpfully for our understanding of this case, that it's New Jersey's position that guns are different, that the First Amendment doesn't hurt people but the Second Amendment does. McDonald squarely rejected that, it did so emphatically. It said guns are not different, the Second Amendment is not different just because it relates to deadly weapons. All of our rights have public safety implications and we don't usually think of the First Amendment, we definitely talk about the exclusionary rule, the right to counsel and other things that protect criminal defendants that do exact a social cost, but nonetheless they do protect Americans in general. Thank you, Your Honors. Thank you, Mr. Gura. The court will take this case and the previous case under advisement. I want to thank counsel for your hard work. We are sorry to encumber you beyond our normal time constraints, but I hope you can appreciate that the court views this case as particularly important in light of the issues involved and in light of the novelty of the doctrine having dealt with two recently decided Supreme Court cases. So we thank counsel for their efforts. Judge Hardiman? Yes. May I suggest that we have counsel in this previous case order a transcript of this very fine oral argument? Absolutely. Counsel, please coordinate that Judge Aldisert's request for transcript with the court's office. Judge Aldisert will call you momentarily for conference. Very fine. Thank you.